Good morning. Just a few preliminary matters. One is that we were informed yesterday that a class from Holy Rosary School will be with us this morning. A good friend, attorney Paul Titus advised us of that, even though I believe Mr. Titus has been unable to attend this morning. We're very pleased to have that class with us and we hope that you will, if not enjoyed, derive something from the experience this morning of listening to the oral arguments that have been scheduled in these three matters. Also, do I understand, Judge Hardiman, that there is to be proceeding to move the admission of three people? Yes, Judge Smith. It's my privilege to move the admission to the bar of the Court of Appeals for the Third Circuit. Three attorneys with whom I've had the privilege of working, Donovan Kokus, who served as my law clerk and just recently joined the United States Attorney's Office as an Assistant United States Attorney, and two of my present law clerks, Adam R. Tarosky and Beth A. Thomas. I can attest to their fitness and their high ethical standards and I would respectfully move their admission to this honorable court. Well, do you want to have them come forward for any purpose? I would. Is the crier going to administer the oath? I understand it. Good. If we could have them then come forward to the bar of the court for the administration of the oath. Congratulations, Counselors. Congratulations. Thank you and welcome. It only gets harder and harder from here. We'll call the first matter for argument, which is the State of Albert P. Schultz v. John E. Paul. Good morning, Your Honors. Good morning. I'm Alexander Schultz, attorney at law. I represent the State of Albert P. Schultz, representative. Just to present a little background. Do you want to reserve any time for rebuttal? Three minutes, Your Honor, for rebuttal. Very well expanded. Thank you, Your Honor. Just to give a little background to this case, essentially this proceeding is only an enforcement action in district court from orders of the Merit Systems Protection Board and Equal Employment Opportunity Commission where the deceased, now represented by the plaintiff, prevailed in a single case against the Postal Service. And in this single case, it had gone on over a series of years where there had been a series of appeals from the administrative judge, the board, Merit Systems Protection Board, and then to the EEOC to progressively obtain additional relief. Unfortunately, the final order in this case did not come down until the summer of 2001, approximately a year after the employee had passed away. And so essentially we're before the lower court just to enforce that action, and it's simply an enforcement action. Mr. Schultz, no question that this matter has a long and torturous history and procedural background to it well before it reached the district court. My concern, quite candidly, is whether we even have jurisdiction over this appeal. And I ask that with our PennWest Associates case as the backdrop to my question because it had a clear holding that administrative closeout orders are not appealable. And speaking only for myself, the May 3rd order in this case, from which I understand you to be appealing, seems to me to mirror the classic language of administrative closeout orders, which have routinely over the years been issued by judges of this court. I spent 14 years using them on this court. The language dealt with no outstanding issues remaining in the case that the case would be marked closed. How do you respond to that, and how would you differentiate this from the administrative closeout order that existed in PennWest Associates? Okay. Basically, looking at the cases that the court brought to my attention, especially looking at the PennWest case and the language in PennWest, I felt the practical effect of the May 3rd order was a dismissal of the case. The May 3rd order was more than an administrative closure, and it really was the effect of dismissal, especially when you combine it with the district court's April 12, 2007 order on summary judgment. But doesn't the very terms of your argument suggest that there was no finality at the district court level? You argued in your brief, and these are your words at the district court, erred in not directing how the value of health benefits should be calculated. That was before it closed the case. Your argument by its very terms suggests that there had been no determination here of the monetary value of these benefits. Did it not? Does it not? Your Honor, on May 2nd, I argued with the judge about that very issue, and I said I was really concerned that she hadn't stated a specific value that was payable, and she said that she felt she had stated it, and even though I didn't see it in the order, that's what she stated, and she stated that she felt these matters would be better addressed by the Third Circuit Court of Appeals. I feel that this is like the language in PennWest where the court, on the motion to reopen, denied the motion and effectively put the party out of court. In the alternative, this is not an appeal timely for the other issues. This is an appeal or effectively an alternative that you could pursue in mandamus action where you want to try to force the court to address issues that you feel exist. So at a minimum, I believe there's jurisdiction to say to the lower court, lower court, you should enter an order that is more specific and addresses these other issues. Once the lower court refuses to consider the matter, you're effectively out, and it's almost effectively like a dismissal, and I see at a minimum there being jurisdiction at least to say to the lower court, more work needs to be done on this case, and that's where I was upset that day because here you are. You're out of court, and you don't know what you're really fighting for. I felt the May 12th order was somewhat ambiguous in my mind. Apparently, in the mind of the Postal Service and the court, it wasn't ambiguous. So that's the struggle you're facing, and if you don't appeal it, then you risk losing your rights, and there is precedent in this Third Circuit that says if there's uncertainty, the better course is to appeal the action. So it's not, especially in an enforcement action, the court really should keep jurisdiction and try to oversee the case until the amounts are paid and until all these little details are determined, and here the court... Not this court. You're talking about the district court. District court, district court, because enforcement is really, they haven't paid to begin with, so why are you pushing the case out of court when you haven't made sure that amounts have been paid and the intricacies have been worked out, and that was something I didn't agree with, but it was a practicality I had to face, and even the court said I couldn't even seek enforcement on this order until after the appeal. So... It sounds like you have no objection to sending it back to the district court to quantify the value of the health benefits and to enter a final order. And anything else that might need to be wrapped up. I wouldn't have an objection to that because that was my original position before the judge, but the parties in the conference on May 3rd felt differently. Do you want me to proceed to the remaining arguments, Your Honor? It's your time. Thank you, Your Honor. I'd like to quickly go over three points in these last four minutes. One is the burden in an enforcement action. The other is the treatment of offsets under the Back Pay Act, and the third is the failure to accommodate issue. In an enforcement action, the burden of proving that the federal agency has complied with the Merit System Protection Board and EEOC orders is really on the federal government. All the information is within the possession of the federal government. It's largely ministerial, just collecting data, putting it into software and producing reports and providing a detailed explanation of why these amounts should be paid. And when you're talking about offsets, I think there's even a case in this particular jurisdiction that has stated the burden of proving the offset is upon the discriminating party. So, clearly, the Postal Service should have come up with more concrete evidence that how it calculated its amounts, that it properly paid all the amounts, that it properly classified the amounts. This happens hundreds of times a year. And so, you know, the burden is really something within the agency. The next thing I would just like to quickly get to is the Back Pay Act itself. Congress enacted the Back Pay Act to provide a uniform and comprehensive authority for the computation of back pay. They wanted to avoid situations like this where you're going into court or fighting back and forth of what the computation is for back pay. Here, we're only dealing with back pay and benefits and interest on back pay. Those are the only issues here. And Congress figured, okay, let's put forth the Back Pay Act with the uniform formula and comprehensive authority. We'll avoid situations like this. But unfortunately, in this case, we got into disputes over stuff like outside earnings versus erroneous payments. That's two of the key concepts here, whether we have a major offset in this case from back compensation payments. And how you offset those workers' compensation payments is a key element to the calculation of interest. If you look at the Back Pay Act itself, it specifically says that back pay and benefits shall be paid. And then further on, it says interest shall be paid on that amount with the only offset being for outside earnings. So Congress, when it enacted the Back Pay Act in its legislative history, said outside earnings are earnings from other employment. And the Postal Service admitted that workers' compensation payments were not earnings from other employment. Yet they offset the workers' compensation before the calculation of interest, even though the statute and the regulation, 5 CFR 550.806C, specifically states interest shall be calculated before erroneous payments. And workers' compensation payments fit in the classic definition of erroneous payments because under 5 USC 8116, federal employees are no longer entitled to workers' compensation payments once he becomes entitled to back pay. And they consider that a classic erroneous payment. And under the regulations, it specifically said you offset that, but after calculation of interest. And on the final point, the failure to accommodate issue, which is raised in the briefs, determines the termination date of back pay. And under clear precedent, including recent Supreme Court cases, where the basis for discrimination is failure to accommodate, back pay continues until the discrimination is remedied. And in this case, that should be in 1990. Thank you, Your Honor. Thank you. Bill. Good morning, and may it please the Court. My name is David Belt. I'm an attorney with the United States Postal Service, and I represent the Postmaster General in this action. We asked the Court to affirm the decision of the District Court, but before addressing that, I want to address the Court's appellate jurisdiction. It's our view that the Court has appellate jurisdiction, that there was a final order, that the May 3rd order was final. And the reason we say this is because the Court decided every issue before the Court. It confirmed with the parties that every issue presented to the Court had been decided. It entered an order then on May 3rd, closing the case, and I'll return to the significance of that. But the order itself constitutes the separate document required under Rule 58, assuming that the closing is sufficiently final. And the order didn't contemplate any further action, and that makes it actually different from the Penn West case. Now, the hardest issue is whether the term closing, the case is closed, is enough to make it a final decision. And I understand that that term is ambiguous, that sometimes it means the case is a decision and sometimes it means it's administratively closed. But I think the significance here is that the District Court itself interpreted the order. On July 11th, this is after the Court entered this order, the appellant did three things. He filed a motion for attorney's fees under Rule 54, which has to be done within 14 days of the final order. He filed a notice of appeal, and he filed a motion for Rule 11 sanctions against the assistant U.S. attorney who tried the case. In rejecting the motion for Rule 11 sanctions, the Court, this was on July 11th, I think it was July 11th, stated the following. Confirming there were no issues remaining with counsel, I entered an order on May 3rd, 2007, dismissing the case. Later in the same order, it says, plaintiff did not file his Rule 11 motion until June 11th, 2007, over 30 days after entry of judgment. So to the extent that there was an ambiguity on the face of the May 3rd order, the Court made abundantly clear in that subsequent order that the May 3rd order was a dismissal. It's also significant that both parties acted as though that were a dismissal. The motion for attorney's fees, the notice of appeal, and it was also entered on the docket as a dismissal, even though, again, the term dismissal doesn't appear on the face of the May 3rd order. For all these reasons, I think this case is quite different from the two that the Court referred us to. The WRS case is one in which there were two orders. The first order closed the case but made very clear it was not final. I mean, on its face, it made clear it was not final. And then there was a second order that expressed a future intention to enter a final order, but then there was never a final order. And I think that's not true. Neither of those facts is present here. As for Penn West, that was a situation where the order did not even purport to resolve the issues that were before the Court, unlike here, where the Court actually said, I have decided the issues that were before me. There are no other issues remaining. She called counsel together and asked, are there additional issues? And as she summarized in her, again, her July 11th order, the plaintiff's counsel did not raise any issues at that time. I held a conference to assure that all issues that remained in the case were decided. So I think that that makes this case distinguishable from Penn West. And I also want to point to something I came across, a case decided by this Court after the two that it mentioned, a Caver case, 420 F. 3rd, 243. And it reaffirms a general principle that when dealing with appellate jurisdiction that you don't exalt form over substance. If the effect of an order remanding the case for lack of jurisdiction would simply be to have the Court enter a piece of paper marked final judgment just to have us return here, that there's no point in doing that. That the Court can decide the issues that were before it because the District Court decided the issues. The District Court decided every issue that was presented. How much money did the District Court say the estate should receive as a result of the health bill? Right. There is no single dollar amount that was ordered because the Court was never asked to order a specific dollar amount. It's not like the Court left the parties had to say. How much money did the Court order be awarded the estate for pension credits? The Court was not asked to award the estate for pension credits. So there was no order. Didn't the District Court say that the estate was entitled to health benefits? Oh, health benefits, yes. I'm sorry. I misunderstood. For health benefits, yes. The question that was before the Court was a question of entitlement. But that was never quantified. It was never quantified by either party. How can we ascertain whether the amount of the health benefits was correct when there was no amount stated? Because the issue before the Court wasn't the amount. If I may take a step back to put this dispute in some context that was before the Court with the Court's permission. The issue before the Court on this issue of fringe benefits generally was almost entirely conceptual. The issue was plaintiff's position below and his expert testified to this effect that fringe benefits across the board should be valued at a formula that's 30 percent of an employee's base salary. Our position below was no, there's no set formula like that. You have to assess fringe benefits including health benefits and other benefits on an individual specific basis. That was the main issue before the Court. The Court decided that issue in the Postal Service's favor. And nobody, the appellant is not disputing that order. So now we're on an individual specific analysis of fringe benefits. The Postal Service calculated fringe benefits and submitted a calculation and there then arrived a second dispute over how does one go about this individual specific assessment. And the plaintiff brought two objections to what we put forward. One was that thrift savings contributions should be included and the second was that health benefits should be included. The Court sided with the Postal Service on the thrift savings plan contributions because he had never contributed and never expressed an interest in contributing. And as to the health benefits, the question was just are health benefits included? Are they a proper portion of fringe benefits? Our argument below was because he was covered at all times during this period under FECA and his health benefits were covered that there was no separate coverage. And he said no, there was something missing. And the Court sided with my opponent. But the problem is there was never anything in the record suggesting what exactly was missing. We're not saying nothing's missing. We're not saying he's not entitled to benefits. There's just no way to assess what those were. But the more important point is the Court wasn't asked to make that assessment. The Court was asked to rule on entitlement. Is he entitled to have health benefits included? The answer is yes. But there was never a request to then specifically quantify that. How is it going to be quantified? Is he supposed to file a new case saying go before the same judge as a related case saying, now I have a new action, please quantify my benefits? One would hope at this point that the parties would be able to be, I can't imagine that the difference, whatever the amount is, I can't imagine it's that high. But one would hope that the parties can resolve it. If the parties can. Courts don't operate that way, counsel. I understand. When have you ever known a trial court to issue an order granting partial relief with the tacit assumption that counsel will somehow come to their senses and resolve the unresolved part of the case? I've been a judge 24 years. I ain't seen that happen yet. Fair enough, Your Honor. But, well, all right, now I've got two things going here. One is on that, this court's role is to review the decision of the district court. And the problem was the district court wasn't asked to decide the quantum, wasn't asked to set a final amount on what the health benefits were. And so the question before this court is, did the district court err, having resolved the issue that it was asked to resolve, and not then reaching out and resolving an issue that it wasn't asked to resolve? And, by the way, if the court does determine that was error, and I can't see how it was, but if the court does determine that that's error, that is an error on the merits. That does not deprive the court of appellate jurisdiction. The court can affirm the decisions that were made and remand for a some certain evaluation of what the health benefits that were lost would be. Now, that's the point on, I forget. The point on what happens now, assuming the parties can't come to an agreement. You know, his remedy, he's not going to be without a remedy. The remedy would be to, if he is unsatisfied, if he shows us what his losses were, and he's unsatisfied with our handling of it, he can go to the district court in an enforcement action to enforce the original judgment. Counsel, there has been so much process in this case over the years that the suggestion that there's a need to initiate a new or separate proceeding is just breathtakingly mind-boggling to me. Well, then, if that is, the court is certainly within its power to affirm on the judgments, the decisions that were made that are before it, and to remand for a, to a fix of some certain. All other amounts, by the way, have been identified by the district court. You know, I think the calculation that the court accepted was $114,000 for back pay and benefits, $77,000 in workers' compensation payments. The only issue left is the court accepted all that, and then the question is, and you have to add health benefits with interest. That was the decision before the court. There's nothing in this record that would have allowed the court to reduce this to some certain. All right, let me ask you a question on the merits. Sure. Did you not concede before the Merit Systems Protection Board and the district court that the Back Pay Act was applicable in this case? It is certainly true that we did not raise that issue before the court. So it's waived here? I, whether it's waived, you know, it wasn't raised below. I'm not sure whether the, whether, you know, it's a congressional, you know, it's a piece of legislation. I'm not sure whether we're empowered to disperse funds that aren't authorized by Congress. So as for the waiver, I don't know whether it's technically waived, but I will say this, that I understand that we didn't present this below. I also, you know, it's our view that really it doesn't matter here because the differences between back pay under Title VII and the back pay under the Back Pay Act are immaterial in this case. All right, but the interest issue is material. The question of when interest is calculated. That's correct. If I read your brief correctly, your chief counter to your opponent's argument is that he's making a technical reading of the statute. Right. And as I read the statute, the statute says precisely what Mr. Schultz claims, namely interest should be included in the amount from which deductions for erroneous payments are made. And that's what the regulation says. I mean, the statute seems to me to say that interest is calculated back beginning at the date the error was made. And, you know, that requires that a decision be made that these are, quote, erroneous payments. And I can see that this doesn't fit neatly into that rubric. But even less persuasive is the notion that these are outside earnings. How in the world could we classify workers' compensation payments as outside earnings under the plain language of that statute? That doesn't seem to fit. Your Honor, we agree that they're not outside earnings under the statute. We also submit that they're not erroneous payments. They're two separate statutes. There's nothing prohibiting him from receiving FECA wage replacement benefits. Then what are they? All right. The way I see it is that this is really an element of pay. That the formula, and I think the parties agree, and I think Your Honor's identified, the formula is essentially the pay you were deprived of minus outside earnings equals some amount that you then compute interest and then deduct erroneous payments. Here, though, the issue is really that he was only deprived of the difference between the amount he says he would have received and the amount he received in FECA wage replacement benefits. That's really the issue. So really what we're talking about is what pay was he deprived of. So really we're going to the issue of pay, that he says he was entitled to this amount of pay during the period. He received this amount of pay. He is entitled to the difference between those two levels. He is indeed entitled to the interest on the difference between those two levels. But what he's not entitled to is interest on the amount that we already paid him. And I think the significance here is that FECA wage replacement benefits are very different from other kinds of shared risk benefits, you know, insurance, unemployment compensation. Under FECA, it's not a situation where the government puts money into a pool and then the pool disperses funds based, you know, when people meet the requirements. This is money that on a one-to-one basis, when the Department of Labor concludes this person is entitled to benefits under FECA, on a one-to-one basis, the Postal Service pays those, the employer pays those benefits. So this is not a situation where we have any kind of outside earning, but we also don't have some kind of third-party benefit. What we have is he says he was entitled to this amount of pay, and we paid him this amount. But there's no statutory basis for that offset. You're making what appears to be a common law of damages argument? Well, I'm making sort of – I think that it is consistent with the language of the statute in the sense that it talks about pay. And when they talk about pay, they talk about the pay somebody is deprived of. In fact, if you look at the – I can't remember if it's in the legislative history or on OPM's notes. I see I'm out of time. May I finish my answer here? Oh, thank you. That it makes clear that when they talk about pay, they talk about pay that the person didn't get because of the improper action. To draw an analogy, if somebody were improperly demoted from a job, say, paying $40,000 a year to a job paying $30,000 a year, what they would be entitled to is the difference between those two amounts of payment. And what we're saying is this is exactly the same. That he was deprived of a certain amount of pay. He was entitled to his original salary. He got this amount, and he's entitled to that difference. So I think it's very consistent with the language. It's certainly not inconsistent with it, and it's very consistent with the purpose of the statute, which is to put the person in the position he would have been in but for the improper action. If the court does not – we have other arguments, of course, and we will otherwise, I guess, rest on our briefs. Thank you very much. Thank you. Mr. Shulman. Thank you, Your Honor. I did express concern to the lower court in our May 2nd conference that the amount had not been quantified. The parties there just basically dismissed that as being non-substantive, not important, or with no basis. In fact, the court threw out a figure of $101,000 approximately that was quantifiable, and I really didn't know how the judge came to that amount until about a month later. The Postal Service disclosed in a subsequent court filing its confidential letter to the court where it had the amount that they felt was finally payable, but unfortunately what they did in their calculation of health benefits, instead of using the employer's share to calculate the value of benefits, they used the employee's share. So that's, you know, the issue was brought up, but it was just dismissed as not being substantive. And the court was asked for it specifically to provide for pension benefits, and that issue has been pursued for many years. So the issue of requesting the value of pension benefits was clearly there. There was information on value of fringe benefits, but primarily the purpose of summary judgment was not to end the litigation, but to provide the formula for calculating these values of benefits, whether it be a pension benefit or whether it be a health benefit. Mr. Schultz, I apologize. I'm about to throw gasoline on a raging jurisdictional fire, but the MSPB order dismissed your case on timeliness grounds, correct? Correct, Your Honor. And under the Supreme Court's decision in SEC versus Chenery, what power did the district court have to review the merits of your case when Chenery would seem to dictate that it would need to consider the case based upon the agency's rationale, namely timeliness? Your Honor, the agency eventually conceded the timeliness issue, and I think that probably mooted any subsequent argument that there still was a timeliness issue and would have eliminated the issue at the MSPB, the fact that there's a concession that there's no timeliness issue. And getting back to the thrift plan, the regulations state that the employee must be given the opportunity to make an election under the thrift plan, and Dillon v. Cole, 746 FedSecond 998, says the collateral source rule does not apply when the statute specifically provides for offsets. These payments or FECA payments and disability payments are clearly alike. May I have another 15 seconds? FECA payments and federal pension payments are clearly alike, and under the regulation, federal disability pension payments are offset before interest is calculated, and they should be treated the same way as OWCP disability payments. You shouldn't treat two payments differently. Thank you, Mr. Schultz. Thank you to both counsel for your arguments. We'll take the case under review.